**KEYWELL CORPORATION,**
Plaintiff–Appellant,

v.

**Daniel C. WEINSTEIN and Anthony Boscarino, Defendants–Appellees.**

No. 1208, Docket 93–7994.

United States Court of Appeals,
Second Circuit.

Argued March 7, 1994.

Decided Aug. 23, 1994.

Stuart A. Smith, New York City (Alfred Ferrer III, Piper & Marbury, Joseph G. Finnerty, Jr., Charles P. Scheeler, of counsel) for plaintiff-appellant.

Thomas E. Lippard, Pittsburgh, PA (Craig E. Frischman, Thorp Reed & Armstrong, of counsel) for defendant-appellee Weinstein.

Jeremiah J. McCarthy, Buffalo, NY (Phillips, Lytle, Hitchcock, Blaine & Huber, of counsel) for defendant-appellee Boscarino.

Before: WALKER, JACOBS, Circuit Judges and CARMAN,* Judge.

JACOBS, Circuit Judge:

Keywell Corporation ("Keywell") has incurred costs for environmental cleanup at an industrial facility that it purchased in 1987 from Vac Air Alloys Corporation ("Vac Air"). Defendants–Appellees Daniel C. Weinstein ("Weinstein") and Anthony Boscarino ("Boscarino") were shareholders, officers and directors of Vac Air prior to the purchase and at the time of the transaction, and were signatories to the Purchase Agreement. Keywell has brought suit against Weinstein and Boscarino, (i) alleging that they induced Keywell to buy the property by making misrepresentations bearing upon the environmental risks at the premises, and (ii) alleging that, as owners and operators of Vac Air, they are strictly liable to Keywell for their equitable share of response costs pursuant to §§ 107(a) and 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). 42 U.S.C. §§ 9607(a) and 9613(f). Following the parties' submission of cross-motions for summary judgment, the district court dismissed Keywell's claims, finding as a matter of law that Keywell could not have reasonably relied on the allegedly fraudulent misrepresentations, and that Keywell had contractually released its right to sue defendants under CERCLA.

We affirm the dismissal of the CERCLA claims on the ground that the parties allocated the risk of CERCLA liability in their Purchase Agreement, the terms of which establish that such risk now falls on Keywell. However, we reverse the dismissal of the diversity fraud claims and remand for further proceedings.

## BACKGROUND

The facts, drawing all justifiable inferences in favor of the non-movant Keywell, are as follows. Weinstein founded Vac Air in 1966 and, until the time Keywell purchased certain Vac Air assets in December 1987, was a principal shareholder, president, chief executive officer, and member of the board of directors of the company. Boscarino joined Vac Air in 1971 as an assistant to the secretary/treasurer, and by 1978 he had become a stockholder, director, and vice-president of the company. Both Weinstein and Boscarino took an active part in conducting the business of Vac Air, which included the operation of a metals recycling plant located in Frewsburg, New York (the "Frewsburg plant").

From the time Vac Air was founded in 1966 until Keywell's acquisition of assets in December 1987, the Frewsburg plant recycled scrap metal—a process that entailed the

* Honorable Gregory W. Carman of the United States Court of International Trade, sitting by designation.

use of trichloroethylene ("TCE"), a chemical now categorized as a hazardous substance by the Environmental Protection Agency (the "EPA"). Two by-products of the recycling process are TCE sludge and TCE oil. During the 1970s, workers at the Frewsburg plant placed TCE sludge in ponds or pits on the property. In addition, they sometimes spread the sludge directly on the ground, where it would dry into a more manageable consistency that could then be moved off site. During the same period, TCE oil was occasionally dispersed on the plant's roads to act as a dust-suppressant. Both Weinstein and Boscarino were aware of at least some of these practices, which ceased in the late 1970s after Vac Air hired a firm to dispose of TCE waste off site.

In 1985, during an unrelated excavation on the property, workers unearthed decomposed remnants of storage drums that had apparently once been filled with a TCE–infused waste product and buried. Weinstein and Boscarino were aware of this discovery, and, upon the advice of counsel, sent a fragment of one of the drums to an independent laboratory for a chemical analysis. That analysis suggested that the buried materials did not pose an environmental problem for Vac Air.

Two years later, on November 10, 1987, Keywell entered into an agreement with Vac Air to purchase certain assets, including the Frewsburg plant (the "Purchase Agreement"). Following execution of the Purchase Agreement (but before the closing on December 16, 1987), Keywell retained the environmental consulting firm of Conestoga–Rovers and Associates ("CRA") to conduct a due diligence environmental audit of the Frewsburg plant. As part of the audit, CRA inspected the site and interviewed Vac Air employees, including Boscarino. The trial testimony of CRA representative Alan Van Norman suggests that Boscarino was asked about waste disposal, and responded that there had been no on-site dumping of hazardous materials.

Upon completion of its audit, CRA issued a report to Keywell. CRA warned that, simply by virtue of the metal recycling that took place there, the Frewsburg plant might be identified by the EPA as a possible source of environmental contamination. CRA's report also contained the following relevant findings and warnings. TCE was present in drainage water samples. Although the nature of past off site disposal of TCE sludge was undetermined, Vac Air personnel had assured CRA that no on-site disposal of waste materials had been made. The proximity of the Frewsburg plant to the municipal water supply justified concern about TCE contamination in the groundwater, for while the possibility of contamination was low, the potential cost could be high. CRA therefore recommended that Keywell conduct additional tests of the groundwater.

Keywell decided not to conduct the further testing that CRA recommended and proceeded to close the sale with Vac Air. The Purchase Agreement provided that "[t]he representations and warranties of [Vac Air] and the Management Stockholders [including Weinstein and Boscarino] herein contained shall be true at and as of the Closing Date, shall be made again at and as of the Closing Date, and shall be true as so made again . . . ." Purchase Agreement ¶ 6.1. In the Purchase Agreement, Vac Air and its management made the following representation bearing upon environmental exposures:

*Environmental Matters.* There has been no storage, disposal or treatment of solid wastes or hazardous wastes by [Vac Air] at any of the leased or owned property included in the Assets [including the Frewsburg plant] in violation of any applicable law, ordinance, rule, regulation, order, judgment, decree or permit or which would require remedial action under any applicable law, ordinance, rule, regulation, order, judgment, decree or permit. There has been no material spill, discharge, leak, emission, injection, escape, dumping or release of any kind onto the properties to be purchased under this Agreement, or into the environment surrounding such properties, of any toxic or hazardous substances as defined under any local, state, Federal or foreign regulations, laws or statutes, other than those releases permissible under such regulations, laws or statutes or allowable under applicable permits.

Purchase Agreement ¶ 2.14. By way of enforcing such representations, the Purchase Agreement provided that Vac Air and its management would

> indemnify and hold harmless [Keywell] from and against any and all damages, losses and expenses caused by or arising out of (a) any breach of warranty or representation by [Vac Air or its management stockholders], or any non-fulfillment of any agreement or covenant on the part of Seller under this agreement, [or] (b) any liabilities or obligations of Seller ... which are not listed [in the Purchase Agreement].

Purchase Agreement ¶ 8.1. These representations and warranties would survive for two years, "except that the representations, warranties and agreements incorporated in or set forth in the Indemnity Agreement shall survive to the extent provided therein." Purchase Agreement ¶ 8.

Under the separate Indemnity Agreement, Vac Air undertakes for a period of thirty years to "indemnify and hold Keywell harmless from any loss, damage, cost or expense relating to or arising from the Assets or the Business ... if the occurrence, event or state of facts which led to such loss, damage, cost or expense arose or existed prior to [December 16, 1987]." Indemnity Agreement ¶ 1. These indemnity obligations, however, are solely the undertakings of Vac Air; the Indemnity Agreement explicitly provides that they "shall be non-recourse to the stockholders, directors and officers of Vac Air [including Weinstein and Boscarino], and shall only be recourse to [certain assets of Vac Air]." Indemnity Agreement ¶ 2.

After Keywell's acquisition of the Frewsburg plant, Weinstein and Boscarino stayed on as managers in Keywell's employ. Prior to the date on which the representations and warranties were due to expire under the Purchase Agreement, various disputes (unrelated to this case) arose between Keywell and the former management of Vac Air. These disputes were resolved on August 11, 1989, by an agreement that the parties intended would "preserve harmony among Keywell's stockholders and promote Keywell's continued success." In this agreement (the "Release"), Keywell unconditionally released the members of Vac Air's Management Group—including Weinstein and Boscarino—from "any claims, liabilities, actions and causes of action Keywell may have under the Purchase Agreement...." Excluded from this Release were certain tax liabilities not relevant to the present dispute.

In June 1990, almost a year after the Release was executed, Keywell learned that a grand jury was investigating the possibility that Vac Air had engaged in on-site disposal of hazardous waste at the Frewsburg plant. After further tests revealed the presence of TCE in the municipal water supply, Keywell entered into an agreement with the New York State Department of Environmental Conservation to institute a comprehensive clean-up plan. Weinstein terminated his employment with Keywell on December 28, 1990. Boscarino was fired by Keywell on March 11, 1991.

On March 12, 1991, Keywell filed the present lawsuit in the United States District Court for the District of Maryland, seeking to hold Weinstein and Boscarino strictly liable for clean-up costs under CERCLA, 42 U.S.C. §§ 9607(a)(2), 9613(f), and alleging that their fraudulent misrepresentations induced Keywell to purchase the Frewsburg plant. Keywell sought money damages on its fraud claim rather than recission of the Purchase Agreement. Eventually the case was transferred to the Western District of New York, where the parties cross-moved for summary judgment.

In a decision issued on March 17, 1993, the district court granted summary judgment against Keywell on its CERCLA claims, finding that Keywell, in signing the Release, had given up its statutory right to seek indemnification for CERCLA liability. The court reasoned that the release of Weinstein and Boscarino from any claims "Keywell may have under the Purchase Agreement" was unambiguous and broad language that included statutory liability under CERCLA. On August 27, 1993, in response to Keywell's motion for reconsideration, the district court issued a second decision, reaffirming its dismissal of the CERCLA claims. The court also granted summary judgment against Keywell on its state-law fraud claims, finding

that Keywell could not have reasonably relied on the alleged fraudulent misrepresentations.

Because we conclude that there are disputed material issues of fact that preclude summary judgment with respect to the state law fraud claims, we reverse the dismissal of those claims and remand to the district court for further proceedings. Nevertheless, as Keywell has not sought recission and has elected instead to affirm the Purchase Agreement, Keywell is bound by all of its terms (including the allocation of CERCLA liability), and may only recover fraud damages. We affirm the district court's dismissal of the CERCLA claims against Weinstein and Boscarino because we find the Purchase Agreement unambiguously demonstrates the parties' intent to allocate their liability under CERCLA and the parties' subsequent Release Agreement extinguished the liability allocated to Weinstein and Boscarino under the Purchase Agreement.

## DISCUSSION

 When reviewing a district court's grant of summary judgment, we must determine whether a genuine issue of material fact exists and whether the district court correctly applied the law. *National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 203 (2d Cir.1989). Summary judgment is appropriate only if, resolving all ambiguities and drawing all factual inferences in favor of the non-moving party, there is no genuine issue of material fact to be tried. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. The party seeking summary judgment bears the burden of demonstrating the absence of any genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

### A. *Fraud.*

 Keywell claims that the defendants fraudulently misrepresented that there had

been no on-site disposal of hazardous substances at the Frewsburg plant, and that waste materials generated by the plant had been disposed of properly. Keywell further states that these misrepresentations induced it to purchase the Frewsburg Plant at a price that did not reflect the environmental risks known to the defendants.

 While the parties chose Maryland law to govern their contract, they do not dispute that questions concerning the *validity* of the contract should be determined by the law of the jurisdiction in which it was made. *See Recovery Consultants, Inc. v. Shih–Hsieh*, 141 A.D.2d 272, 534 N.Y.S.2d 374, 375 (1988). We agree that New York law applies. In New York, a plaintiff claiming fraudulent misrepresentation must prove that (1) defendant made a material false representation, (2) defendant intended to defraud plaintiff thereby, (3) plaintiff reasonably relied on the representation, and (4) plaintiff suffered damage as a result of such reliance. *See Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir. 1987); *see also Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1044 (2d Cir.), *cert. denied*, 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986). The district court granted summary judgment in favor of defendants because it found—as a matter of law—that any reliance by Keywell on the defendants' representations regarding TCE disposal would have been unreasonable. Viewing the evidence in the light most favorable to Keywell, as we must in reviewing this grant of summary judgment, we conclude that a reasonable jury could find that Keywell reasonably relied on the defendants' statements.

Keywell claims that it relied on two separate representations when it agreed to purchase the Frewsburg plant. First, Keywell asserts that Boscarino told the CRA investigators that there had been no on-site burial of hazardous waste. Second, Keywell points to the environmental representations made in the Purchase Agreement (which both Weinstein and Boscarino signed) to the effect that no hazardous material had been released or disposed of on the premises of the Frews-

burg plant.[1] The district court determined that Keywell could not have reasonably relied on these representations because CRA's environmental audit had put Keywell on notice that the representations may have been false. The court noted that CRA's report alerted Keywell to the possibility of groundwater contamination, the extent of which could only be determined through additional testing, and that Keywell decided not to conduct this recommended testing. The district court also found that any reliance was unreasonable because Keywell was experienced in business matters and had access to files containing information about the discovery of the buried TCE-tainted material.

■ When a party is aware of circumstances that indicate certain representations may be false, that party cannot reasonably rely on those representations, but must make additional inquiry to determine their accuracy:

> [if plaintiff] has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.

*Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80–81 (2d Cir.1980) (applying New York law) (quoting *Schumaker v. Mather*, 133 N.Y. 590, 598, 30 N.E. 755 (1892)), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). "Decisions holding that reliance on misrepresentations was not justified are generally cases in which plaintiff was placed on guard or practically faced with the facts." *Id.* at 81; *see Ittleson v. Lombardi*, 193 A.D.2d 374, 596 N.Y.S.2d 817, 819 (1993). Moreover, "[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Grumman*

*Allied Industries v. Rohr Industries, Inc.*, 748 F.2d 729, 737 (2d Cir.1984).

Obviously, Keywell was aware of CRA's environmental report warning of TCE contamination and advising further testing to determine the actual extent of the problem. However, we do not agree that Keywell was thereby "placed on guard or practically faced with the facts" so that Keywell's reliance on defendants' representations was unreasonable as a matter of law. According to deposition testimony by Keywell's environmental consultants, the contamination revealed in the report was entirely consistent with incidental spillage of solvents that could be expected at any metals recycling plant, and did not contradict the defendants' representations that there had been no dumping or other release of hazardous substances on the Frewsburg property. The environmental audit contained a statement that "[p]lant personnel have informed CRA that on-site disposal of waste materials was not practiced." The audit did not indicate that this assurance was in any way at odds with the results of its investigation. In fact, the defendants' representations that there had been no on-site disposal may have influenced Keywell's decision to reject CRA's recommendation for further testing. A reasonable jury could conclude that Keywell, having conducted environmental due diligence and received a report that was consistent with the defendants' representations, had no obligation to investigate further, and that Keywell would have authorized further testing by CRA at any spot identified by defendants as a place where buried waste had been found. Keywell has raised genuine questions of fact as to whether CRA's environmental findings were consistent with the defendants' representations, and whether Keywell should have undertaken additional testing given the representations made to CRA during its investigation and the defendants' willingness to make these express representations in the Purchase Agreement.[2]

---

1. Because contractual representations, warranties and indemnities drafted by counsel are often simply instruments for allocating risks and responsibilities, there may be factual and legal issues as to whether or not the second representation can support reasonable reliance.

2. Although Keywell's complaint and brief appear to raise the claim of fraudulent concealment, neither the parties nor the district court specifically addressed this issue. We express no opinion as to whether there are disputed questions of fact regarding the elements of that claim.

■ The district court provided an alternative ground for dismissal based on its finding that Keywell, for various reasons, was not entitled to rescind its contract with the defendants. Keywell does not contest this part of the district court's ruling. However, Keywell's fraud claim cannot be dismissed simply because rescission is not an available remedy. In Count I of its complaint, which alleges common law fraud, Keywell seeks money damages. A defrauded party is permitted to affirm a contract and seek relief in damages. *See, e.g., Clearview Concrete Products Corp. v. S. Charles Gherardi, Inc.,* 88 A.D.2d 461, 453 N.Y.S.2d 750, 754 (1982) ("Upon discovering fraud, a purchaser may tender return of the property and seek rescission or he may retain the property and seek recovery of damages deriving from the fraud."). Difficult as it may be, Keywell may be able to show, without inviting speculation, that some definable portion of its environmental costs are attributable to what defendants allegedly misrepresented, rather than to what Keywell did know. However, Keywell's election to affirm the contract rather than seek rescission impacts Keywell's rights to avoid contractual limitations on damages for breach of representations and warranties. These limitations have an important bearing on Keywell's CERCLA claims.

## B. *CERCLA.*

■ Keywell asserts that it is entitled under CERCLA to recover from Weinstein and Boscarino the costs of the environmental clean-up at the Frewsburg plant. Defendants respond that, under the Purchase Agreement, Keywell assumed all environmental liability upon the expiration of the two-year indemnity provision. The district court ruled that the indemnification provision of the Purchase Agreement did not include CERCLA liability, but dismissed Keywell's CERCLA claims nevertheless, on the ground that the Release was "sufficiently broad to include CERCLA liability and thus bars plaintiff's claims ... against Weinstein and Boscarino." We agree that Keywell gave up its right to assert CERCLA claims by signing the Release, because we conclude that the parties unambiguously allocated liability for CERCLA losses in the Purchase Agreement.

■ Private parties may contractually allocate among themselves any loss they may suffer by the imposition of CERCLA liability. *See Commander Oil Corp. v. Advance Food Service Equipment,* 991 F.2d 49, 51 (2d Cir.1993); 42 U.S.C. § 9607(e)(1). Courts will enforce such a contract where the provisions evince a clear and unmistakable intent of the parties to do so. *See Purolator Products Corp. v. Allied–Signal, Inc.,* 772 F.Supp. 124, 130–31 (W.D.N.Y.1991). The Purchase Agreement and the contemporaneous Indemnity Agreement unambiguously allocate to Keywell the risk of CERCLA losses after the expiration of the indemnification period.

Weinstein and Boscarino were signatories to the Purchase Agreement, and in that document made explicit environmental representations and warranties to Keywell. In particular, they warranted (a) that hazardous material at the Frewsburg plant had not been stored, treated or disposed of "in violation of any applicable law," or in such a way as to "require remedial action under any applicable law"; and (b) that there had been "no material spill, discharge, leak, emission, injection, escape, dumping or release of any kind onto [the Frewsburg plant], or into the environment surrounding [the Frewsburg plant], of any toxic or hazardous substances as defined under any local, state, Federal or foreign regulations, laws or statutes...." These representations unequivocally cover conduct affecting the environment that could give rise to liability under CERCLA, and effectively warrant that there have been no violations of CERCLA at the Frewsburg plant.

The Purchase Agreement spelled out the scope and duration of the parties' obligations in the event of a breach of any warranty or representation (including the representation concerning environmental exposures). First, "representations and warranties ... survive the Closing for a period of two (2) years." Purchase Agreement ¶ 8. Second, Weinstein and Boscarino indemnify Keywell for any breach of warranty or representation that may come to light within two years after the closing. Purchase Agreement ¶ 8.1. Third,

the maximum indemnification by Weinstein and Boscarino was limited to an aggregate of $5 million, each individual to be liable only for the percentage of $5 million equal to his percentage stock interest in Vac Air. Purchase Agreement ¶ 8.3.

The contemporaneously executed Indemnity Agreement does not affect this understanding, but it does reinforce our conclusion that Weinstein and Boscarino were to have no obligation to indemnify Keywell beyond the two-year period specified in the Purchase Agreement. Thus the Indemnity Agreement provides for Vac Air to indemnify Keywell for thirty years from any loss resulting from circumstances existing at the time the Purchase Agreement was signed, but explicitly provides that "[t]he indemnification obligations of Vac Air ... shall be non-recourse to the stockholders, directors and officers of Vac Air."

These documents demonstrate and confirm that all obligations of Weinstein and Boscarino to indemnify Keywell were (a) capped at a percentage of $5 million, and (b) limited to two years. Weinstein and Boscarino made explicit environmental representations and warranties, and were liable for breach of those representations and warranties in accordance with the indemnity provisions. While Vac Air's thirty-year duty to indemnify Keywell would apply to CERCLA costs, Keywell agreed that it would forgo recourse against Weinstein and Boscarino after the two-year indemnity period expired.

We conclude that the contracts between and among the parties sufficiently demonstrate an intent to allocate responsibility for CERCLA losses. Under the Purchase Agreement, Weinstein and Boscarino shared with Vac Air the risk of such losses for two years, at which time the risk shifted to Keywell (except insofar as it could recover from Vac Air). The indemnity obligation of Weinstein and Boscarino was cut short by a few months with the signing of the Release on August 8, 1989, which discharged Weinstein and Boscarino "from any claims, liabilities, actions and causes of action Keywell may have under the Purchase Agreement." As the district court explained, Keywell cannot selectively and belatedly rescind isolated provisions of the Purchase Agreement. Therefore, Keywell cannot maintain a suit against the defendants under CERCLA that is barred by the allocation of loss in that contract. Keywell's only available relief is money damages in an amount that Keywell can prove is attributable to the defendants' alleged fraud.

## CONCLUSION

For the foregoing reasons, we affirm the grant of summary judgment against Keywell on the CERCLA claims, reverse the grant of summary judgment on Keywell's fraud claims, and remand to the district court for further proceedings.