Wilburger v Ava Labs, Inc. (2025 NY Slip Op 51072(U))

[*1]

Wilburger v Ava Labs, Inc.

2025 NY Slip Op 51072(U)

Decided on July 3, 2025

Supreme Court, New York County

Chan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 3, 2025
Supreme Court, New York County

Christian Wilburger, Plaintiff,

against
Ava Labs, Inc., Defendant.

Index No. 652559/2024

Counsel for Plaintiff: Maria Isabel S. Guerrero of Law Office of Maria Isabel S. Guerrero
Counsel for Defendant: Justin M. Sher, Mark Cuccaro, and Wes Erdelack of Sher Tremonte LLP

Margaret A. Chan, J.

The following e-filed documents, listed by NYSCEF document number (MS001) 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 were read on this motion to/for DISMISS.
Plaintiff Christian Wilburger brings this action against defendant Ava Labs, Inc. (Ava Labs), asserting claims in connection Ava Labs' purported failure to compensate Wilburger for services rendered pursuant to an independent contractor agreement. Now before the court is Ava Labs' motion, pursuant to CPLR 3211(a)(1) and (a)(7), for an order dismissing the Complaint's Third Cause of Action for fraudulent inducement/misrepresentation (NYSCEF # 6). Wilburger opposes the motion. For the following reasons, Ava Labs' motion is denied in part and granted in part.
Background
The following facts are drawn from the Complaint (NYSCEF # 1 — Complaint or compl) and those exhibits submitted in connection with Ava Labs' application. These facts are accepted as true solely for purposes of this motion.
Ava Labs is a New York City-based company that offers an open-source framework to businesses for developing decentralized finance applications and blockchain solutions through its platform known as Avalanche (see compl ¶¶ 4, 7-8, 10). To facilitate development on this framework, Ava Labs uses a cryptocurrency token called AVAX as its basic unit of account (see id. ¶¶ 9-10).
In an effort to build up its branding and corporate identity, Ava Labs contracted with Wilburger in 2019 pursuant to an Independent Contractor Agreement (the ICA) (see compl ¶¶ 11, 14, 22; NYSCEF # 8 — ICA ¶ 1). Wilburger agreed to render services such as logo design, company graphic design, website development, and business card design (see the ICA ¶ 12 & at Ex A § 2[a]-[f]). In exchange for these services, Ava Labs agreed to pay Wilburger a lump sum [*2]of $3,800 at the end of the engagement and/or "a mutually agreed upon fixed lump sum payment" for any "extra requests" deemed "out of the scope of" the ICA's enumerated services (see compl ¶¶ 11, 13; ICA at Ex A § 3).[FN1]
Upon termination of the ICA, Ava Labs was obligated to pay, within 30 days, all amounts due and owing to Wilburger for services actually performed (compl ¶ 50; ICA ¶ 9).
Between 2019 and 2023, Wilburger devoted more than 2,300 hours to expand Ava Labs' community outreach and provided, at Ava Labs' request, an array of services that were outside scope of the ICA (see compl ¶¶ 14-22). In exchange for these additional services, Ava Labs agreed to compensate Wilburger with AVAX tokens (see compl ¶ 23). An initial compensation of AVAX tokens occurred in or around April 2020, when Ava Labs, via one of its subsidiaries, offered Wilburger the right to acquire 100,000 AVAX tokens at a rate of $0.33 per token through a contract dated April 12, 2020 (the April 12 Agreement) (see compl ¶ 25). The next month, on May 20, 2020, Wilburger wired $33,000 USD Coin (USDC)[FN2]
and received 100,000 AVAX tokens in return (id. ¶ 32). But beyond this transfer, Wilburger alleges Ava Labs has purportedly used a series of agreements and amendments to deprive him of an additional 150,000 AVAX tokens purportedly due and owing to him (see id. ¶¶ 32, 39, 40-41, 55).
Initially, on May 15, 2020, Ava Labs, via one of its subsidiaries, granted Wilburger the right to acquire 100,000 AVAX tokens at a rate of $0.50 per token (compl ¶ 26). Although it is not fully clear from the face of the Complaint when or why this occurred, this amount was apparently increased to 150,000 AVAX tokens (see id. ¶ 27). A few days later, on May 19, 2020, Wilburger was presented with an agreement titled "Proposed Changes to your Consultant Agreement," which amended the ICA (the May 19 Amendment) (id. ¶ 29; NYSCEF # 9 — May 19 Amendment).
Under the May 19 Amendment, Section 3 of Exhibit A of the ICA would be amended to provide that Wilburger "will be granted a one-time right to purchase 150,000 AVA Mainnet tokens" (compl ¶¶ 29-30; May 19 Amendment at 1). Section 3 of Exhibit A was further amended to state that Wilburger's tokens "will vest in 25% of the Restricted Tokens after 12 months of continuous service, and the balance will vest in equal monthly installments over the next 36 months of continuous service" (May 19 Amendment at 1). Wilburger maintains that, notwithstanding the inclusion of the terms "right to purchase" and "continuous service" in the May 19 Amendment, he was assured by Ava Labs that he had already earned the 150,000 AVAX tokens and that, according to Ava Lab's Chief Operating Officer Kevin Sekniqi, the inclusion of the term "continuous service" was "just legalese" and "largely irrelevant" (see compl ¶¶ 30-31). Wilburger accordingly signed the May 19 Amendment (see id. ¶ 30; May 19 [*3]Amendment at 1)
On June 7, 2020, after Wilburger received his compensation of 100,000 AVAX tokens, Ava Labs purportedly agreed, via chat communication between Wilburger and Sekniqi, that Wilburger would—through "a discount of 33% on the current sale" of AVAX tokens and a $17,000 USDC "credit" to "top off" Wilburger's initial $33,000 USDC investment—be entitled to 150,000 AVAX tokens that would "unlock[] at the investor schedule" (compl ¶¶ 35-36). In that same communication, Sekniqi also indicated that Ava Labs would offer Wilburger "an additional 90k tokens on top of the contract," which would "unlock[] at the employee 4 year vesting schedule" (id. ¶ 36). Ava Labs then purportedly later agreed, again via chat communication, to increase the additional 90,000 AVAX tokens to 100,000 AVAX tokens (id. ¶ 40). Hence, Wilburger avers, Ava Labs, through Sekniqi, had reiterated that it was granting him 150,000 AVAX tokens, with 50,000 AVAX tokens still outstanding,[FN3]
and confirmed that Wilburger would also receive an additional 100,000 AVAX tokens in compensation for his services (see id. ¶¶ 37-40). In other words, Wilburger was essentially promised a total of 250,00 AVAX tokens from Ava Labs and, to date, he had received 100,000 of them (see id.).
Wilburger asserts that he was repeatedly assured by Ava Labs' Chief Executive Office, its Head of Strategy and Operations, and additional personnel, that his acquisition of the outstanding 150,000 AVAX tokens "had been conclusively secured" in exchange for Wilburger's professional contributions and USDC payments (see compl ¶ 42). Yet by September 16, 2020, Ava Labs had still not transferred to Wilburger the remaining 150,000 AVAX tokens that were promised by Sekniqi (compl ¶ 43). Instead, Ava Labs presented Wilburger with a document titled the Antarctica, Inc. 2020 Equity Incentive Plan (the Antarctica Agreement) (compl ¶ 43; NYSCEF # 11).
Under the terms of the Antarctica Agreement, Ava Labs, through Antarctica, would grant Wilburger the option to acquire 150,000 AVAX tokens (see compl ¶¶ 44-45; NYSCEF # 11 at 2-7). This option would "vest with respect to one-forty-eighth (1/48th) of the covered Shares on the 12-month anniversary of the Vesting Commencement Date and then as to an additional one-forty-eighth (1/48th) of the covered Shares on each subsequent month thereafter for the next forty-seven months" (NYSCEF # 11 at 2, 5, 12). Like the May 19 Amendment, Wilburger's option to purchase AVAX tokens was subject to his "continuous service" (id.).
Upon receiving the Antarctica Agreement, Wilburger purportedly expressed various concerns, including the fact that the 150,000 AVAX tokens that he was still owed were now seemingly being converted into an option (compl ¶¶ 46, 53). In response to these concerns, Wilburger was told by Ava Labs' agents that (1) Wilburger had already earned the 150,000 AVAX tokens "with [his] labor," (2) there would be no need for Wilburger to purchase the AVAX tokens, and (3) the Antarctica Agreement was nothing more than a recordkeeping formality (see id. ¶¶ 46, 49-51).[FN4]
 Although he continued to have questions about the Antarctica [*4]Agreement, Wilburger eventually signed the agreement on September 21, 2020, purportedly under pressure from Ava Labs (see id. ¶¶ 47-48).
On October 28, 2023, Ava Labs terminated the ICA without cause (id. ¶ 56). Yet, despite its repeated assurances, Ava Lab has, to date, never issued any of the remaining 150,000 AVAX tokens purportedly owed to Wilburger (see id. ¶¶ 52, 54-55, 58). Hence, Wilburger maintains, Ava Labs has failed to pay him all amounts due and owing under the ICA for services actually performed (see id. ¶ 57). Wilburger further maintains that Ava Labs' failure to issue the remaining 150,000 has prevented him from earning valuable "staking"[FN5]
rewards in an amount of at least 69,650 AVAX tokens (id. ¶ 66).
Legal Standards
On a motion to dismiss pursuant to CPLR 3211, a pleading is "afforded a liberal construction" (Leon v Martinez, 84 NY2d 83, 87 [1994]). Courts will "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (id. at 87-88).
Under CPLR 3211(a)(7), a party may seek dismissal when a pleading "fails to state a cause of action." Such a motion tests the facial sufficiency of a pleading, assessing whether plaintiff has stated a claim "cognizable at law" or, if the claim is cognizable, whether plaintiff has "failed to assert a material allegation necessary to support the cause of action" (see Basis Yield Alpha Fund (Master) v Goldman Sachs Group, Inc., 115 AD3d 128, 135 [1st Dept 2014]). Whether a plaintiff can ultimately establish its allegations is not considered when determining a motion to dismiss under CPLR 3211(a)(7) (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]).
Meanwhile, CPLR 3211(a)(1) provides that a party may move for judgment dismissing one or more causes of action asserted against it on the ground that "a defense is founded upon documentary evidence." A motion to dismiss on this basis will be granted "only where the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law" (Goshen v Mutual Life Ins. Co. of NY, 98 NY2d 314, 326 [2002]; Amsterdam Hospitality Group, LLC v Marshall-Alan Assoc., Inc., 120 AD3d 431, 433 [1st Dept 2014]).
Discussion
In his Complaint, Wilburger asserts three causes of action against Ava Labs, including claims for breach of contract, unjust enrichment, and fraudulent inducement (see compl ¶¶67-[*5]82). Ava Labs now seeks dismissal of Wilburger's fraudulent inducement/misrepresentation claim (NYSCEF # 13 — MOL at 7-11; NYSCEF # 18 — Reply at 1-7). As explained below, insofar as Wilburger's fraudulent inducement claim is predicated on misrepresentations by Ava Labs that induced him to sign the May 19 Amendment and Antarctica Agreement, dismissal is not warranted at this time.
It is well settled that, to state a claim for fraudulent inducement, a plaintiff must allege "(1) a misrepresentation or an omission of material fact which was false and known to be false by the defendant, (2) the misrepresentation was made for the purpose of inducing the plaintiff to rely upon it, (3) justifiable reliance of the plaintiff on the misrepresentation or material omission, and (4) injury" (see CANBE Props., LLC v Curatola, 227 AD3d 654, 656 [2d Dept 2024]). Put differently, a claim for fraudulent inducement "requires a showing that a defendant made a false representation for the purpose of inducing another to act on it" (see EVUNP Holdings LLC v Dman, 225 AD3d 469, 469 [1st Dept 2024]). These elements of fraud must be pleaded in detail (see Salvador v Touro College, 139 AD3d 1, 8 [1st Dept 2016], citing CPLR 3016 [b]), although this pleading requirement should "not be confused with [requiring] unassailable proof of fraud" (see Pludeman v N. Leasing Sys., Inc., 10 NY3d 486, 492 [2008]).
Here, although the Complaint is certainly not a model of clarity, it appears that all of the required elements of a fraudulent inducement claim are present. To start, Wilburger maintains that, after entering into the ICA, Ava Labs agreed to compensate him for the scope, quality, and impact of his services rendered and that it would do so in the amount of 250,000 AVAX tokens (see compl ¶¶ 14-22, 25-27, 32, 35-36, 37, 40, 42). Wilburger then continues that, even though he received 100,000 out of the 250,000 AVAX tokens (id. ¶¶ 32, 39-41), he was later presented with two separate agreements—the May 19 Amendment and the Antarctica Agreement—that indicated that he only had a "right to purchase" and/or "option" to acquire the remaining 150,000 AVAX tokens that was also contingent on his continuous service on behalf of Ava Labs (see id. ¶¶ 29-30, 43-44; May 19 Amendment at 1; NYSCEF # 11 at 2-12).
As alleged, Wilburger apparently recognized that the terms of these agreements were at odds with Ava Labs' unconditional promise to compensate him with the remaining 150,000 AVAX tokens he was owed (see compl ¶¶ 27, 30-31, 46-47, 53). Ava Labs, however, repeatedly assured Wilburger that all of his AVAX tokens were already earned and that the May 19 Amendment and Antarctica Agreement were nothing more than mere formalities that had no actual bearing on his earned compensation (see id. ¶¶ 24, 30-31, 49-51). Thus, relying on Ava Labs' assurances, Wilburger executed these two agreements (see id. ¶¶ 29-31, 47; May 19 Amendment at 1; NYSCEF # 11 at 2-12). Eventually Ava Labs terminated Wilburger's contractual relationship under the ICA and, contrary to its prior representations, used the May 19 Amendment and the Antarctica Agreement as a basis to deny compensating Wilburger with his remaining 150,000 AVAX tokens (see compl ¶¶ 24, 55). Consequently, as alleged, Ava Labs' repeated assurances proved to be false (see generally id. ¶¶ 24, 29-31, 47, 55)
To be sure, it remains to be seen whether Wilburger will ultimately be able to prove these claims. But these allegations, accepted as true with all reasonable inferences drawn in Wilburger's favor, establish that Ava Labs used false assurance to convince Wilburger to sign various agreements that could be later used to deprive him of the compensation to which he was rightfully entitled. As a result, Wilburger has sufficiently stated a claim for fraudulent inducement with enough detail to survive a motion to dismiss.
Ava Labs nevertheless maintains that Wilburger's fraudulent inducement claim must be [*6]dismissed because he has failed to establish justifiable reliance (MOL at 9-11; Reply at 2-4). Specifically, Ava Labs argues that the extra-contractual statements and assurances upon which Wilburger relies cannot, as matter of law, be used to contradict the express terms of the May 19 Amendment and Antarctica Agreement (MOL at 9-10). The court disagrees.
It is, of course, true that a party is generally not permitted to introduce extrinsic evidence to vary or add to the terms of a contract (see generally NAB Constr. Corp. v Consolidated Edison Co. of NY, Inc., 222 AD2d 381, 381 [1st Dept 1995] ["The parol evidence rule, which prohibits the introduction of extrinsic evidence to vary or add to the terms of contract"]). The law is, however, also equally clear that "where the complaint states a cause of action for fraud, the parol evidence rule is not a bar to showing the fraud" unless the agreement between the parties expressly disclaims reliance on the particular misrepresentation underlying the fraud claim (see Danann Realty Corp v Harris, 5 NY2d 317, 320 [1959]; International Bus. Machs. Corp. v GlobalFoundries US Inc., 204 AD3d 441, 442 [1st Dept 2022] [permitting use of parol evidence to establish fraudulent inducement claim where "the various contracts' merger clauses [were] general, vague, and merely omnibus statements"]; Merrill Lynch, Pierce, Fenner & Smith, Inc. v Wise Metals Group, LLC, 19 AD3d 273, 275 [1st Dept 2005] [holding that "only where the parties expressly disclaim reliance on the particular misrepresentations is extrinsic evidence barred" for purposes of a fraudulent inducement claim]). Here, Ava Labs fails to identify any specific disclaimer of reliance on the at-issue alleged misrepresentations made by Ava Labs. For this reason, there is no basis at the pleading stage to conclude that, as a matter of law, it was unreasonable for Wilburger to rely on Ava Labs' extra-contractual misrepresentations to support his fraudulent inducement claim in connection with his execution of the May 19 Amendment and Antarctica Agreement (cf. Laduzinski v Alvarez & Marsal Taxand LLC, 132 AD3d 164, 169 [1st Dept 2015] [holding that fraudulent inducement claim relying on parol evidence could proceed where agreement only contained a "general and vague" merger clause that made "no reference to the particular misrepresentations allegedly made here by defendants" [alterations omitted]]; see generally Braddock v Braddock, 60 AD3d 84, 88 [1st Dept 2009] [observing that the issue of justifiable reliance is "generally one of fact"]).
Ava Labs' repeated reliance on Sinclair Broadcast Group v Bank of Montreal (1995 WL 70577 [SD NY, Feb. 21, 1995, No. 94 Civ. 4677 (LMM)]) does not compel a different result. In Sinclair, plaintiff and defendant had entered into a commitment letter in which, among other things, defendant committed to $25 million of financing to plaintiff, subject to several preconditions to participation (see id. at *1). One such precondition to financing was that there be "[n]o material adverse change in [plaintiff's] business condition (financial or otherwise), performance, operations, properties or prospects" (id.). According to the Sinclair plaintiff, prior to signing, it requested clarification from defendant Bank as to what it meant by "material adverse change," and defendant Bank, in turn, purportedly claimed that the clause was "not significant" and declined to provide any further clarification on the standard (id. at *2). Following the signing of the letter, the Sinclair plaintiff provided financial projections to defendant Bank, which caused defendant to declare that the Sinclair plaintiff had suffered a material adverse change in its financial conditions and, in turn, withdrew from the commitment letter (id.). The Sinclair plaintiff later commenced suit for, among other claims, fraud, which defendant moved to dismiss (id. at *2-3).
In granting the motion, the district court first observed that the "reasonableness of reliance in fraud actions is to be determined by a fact-finder" but that "under New York law, a [*7]claim for fraudulent inducement will not lie where a plaintiff asserts reliance upon an oral promise that the defendant would not enforce a condition in the written contract" (1995 WL 70577 at *8-9). Critically, however, the court also made it clear that the specific instances in which reliance is generally found to be unreasonable are those circumstances where a plaintiff has been "placed on guard or practically faced with the facts" of the purported misrepresentation or is otherwise a "sophisticated" business entity "engaged in a major transaction" (id., citing Keywell Corp. v Weinstein, 33 F3d 159, 164 [2d Cir 1994]). With these legal principles in mind, the court determined that plaintiff's case presented a situation in which courts are "particularly disinclined to entertain claims of justifiable reliance" because (1) plaintiff was "faced with the facts" given the specific definition and parameters set forth in the "material adverse change" clause, and (2) plaintiff and defendant where sophisticated business entities engaged in a major transaction with access to critical information at the time of entering into the commitment letter (see id.). It was on these grounds that the court concluded that plaintiff's fraud claim must fail (id.).
In this case, by contrast, there is no indication at the pleading stage that the terms of the May 19 Amendment or Antarctica Agreement placed Wilburger "on guard" to any alleged misrepresentations so as to render his reliance on Ava Labs' extra-contractual statements unreasonable. To the contrary, as alleged, Wilburger was essentially led to believe that the requirements and conditions set forth the May 19 Amendment and Antarctica Agreement had essentially been satisfied. There is similarly no basis to conclude from the pleadings that Wilburger was a sophisticated party who failed to take advantage of his access to information prior to signing the May 19 Amendment or Antarctica Agreement. Consequently, the facts and holding of Sinclair are entirely distinguishable from, and hence inapplicable to, the case at bar.
The above holding notwithstanding, a different conclusion is warranted with respect to Wilburger's other purported claim—seemingly clarified for the first time in his opposition brief—that he was fraudulently induced to transfer $50,000 USDC in exchange for a promise to transfer 150,000 AVAX tokens (see NYSCEF # 17 at 17, citing compl ¶¶ 32-41, 78-82). As a preliminary matter, although the Complaint does reference Wilburger's transfer of $50,000 USDC (see compl ¶¶ 32, 38), he failed to plead any facts, let alone with specificity, suggesting that this transfer was the product of fraud or even the basis of a fraud claim (cf. id. ¶¶ 77-82 [alleging that "[d]efendant made false representations to [Wilburger] . . . in order to induce [him] to sign agreements indicating that the 150,000 AVAX tokens were not actually fully vested" and that plaintiff "justifiably relied on [these] misrepresentations"]). Therefore, even if Wilburger were asserting this particular claim as part of his Third Cause of Action, it was not pleaded with any sufficient amount of particularity to survive a motion to dismiss (see CPLR 3013 ["Statements in a pleading shall be sufficiently particular to give the court and parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved and the material elements of each cause of action or defense"]). But even assuming the allegations underlying specific theory of fraud was sufficiently particular, the claim would still be dismissed as currently framed because, as Ava Labs aptly notes, "a mere failure to perform" a promise is "insufficient to sustain a cause of action alleging fraud" (Cavalry Invs., LLC v Household Automotive Fin. Corp., 8 AD3d 317, 318 [2d Dept 2004]).
In sum, Wilburger has sufficiently stated a claim for fraudulent inducement to the extent his claim is based on purported misrepresentations inducing him to sign the May 19 Amendment and Antarctica Agreement—the fraud-based claim that actually appears in the Complaint. But he [*8]has failed to state a claim for relief insofar as he is claiming that he was fraudulent induced to transfer $50,000 USDC to Ava Labs—a claim that appears nowhere in the Complaint. For these reasons, Ava Labs' motion to dismiss the Complaint's Third Cause of Action is essentially granted in part and denied in part.
Conclusion
For the foregoing reasons, it is hereby
ORDERED that defendant Ava Labs' motion to dismiss granted in part and denied in part in accordance with this Decision and Order; and it is further
ORDERED that within 30 days of the e-filing of this order, defendants shall file an answer to the Complaint; and it is further
ORDERED that that a preliminary conference shall be held via Microsoft Teams on August 27, 2025, at 10:30 AM or at such other time that the parties shall set with the court's law clerk. Prior to the conference, the parties shall first meet and confer to stipulate to a preliminary conference order, available at https://www.nycourts.gov/LegacyPDFS/courts/comdiv/NY/PDFs/part49-PC-Order-fillable.pdf, in lieu of a conference; and it is further
ORDERED that counsel for plaintiff is directed to serve a copy of this order, together with notice of entry, upon defendant and the Clerk of the Court within 10 days of this order.
DATE 7/03/2025
MARGARET A. CHAN, J.S.C.

Footnotes

Footnote 1:The parties agreed that the ICA could not be "amended in any respect other than by written instrument executed by the party against whom enforcement is sought," that "[t]he terms and conditions" of the ICA "constitute[d] the entire agreement between the parties," and that "no agreement or understanding varying or extending the [terms of the ICA] shall be binding" unless in writing and signed by the party to be bound (see ICA ¶ 14).

Footnote 2:As explained in the Complaint, USDC is a type of cryptocurrency that is pegged to the United States dollar (USD) to maintain a stable value (compl ¶ 33). Each USDC is meant to be the equivalent of one USD and is commonly used for trading and payments (id. ¶ 34).

Footnote 3:Specifically, because Wilburger paid a total $50,000 USDC and previously received 100,000 AVAX tokens, 50,000 tokens remained outstanding from this alleged private sale (see compl ¶¶ 38-39).

Footnote 4:In particular, Ava Labs' Head of Strategy and Operations, Phillip Liu, claimed that the Antarctica Agreement was intended to "help with taxes," while another employee, Carianne Fairbairn, stated that "[Wilburger did] not need to purchase the tokens" because although the Antarctica Agreement "defines the purchase price per token," Wilburger "ha[d] already purchased the tokens with your labor" (compl ¶¶ 49-51).

Footnote 5:According to the Complaint, "staking" is a process by which individuals can allocate a specified quantity to digital tokens as a security mechanism for a blockchain's network (see compl ¶¶ 60-62, 65). Because these "staking" participants' tokens are "locked" as a result of the "staking" process, participants are given "rewards" in the form of additional tokens (id. ¶ 63). Thus, the Complaint explains, "staking" rewards can be viewed as analogous to interest payments compensating participants for their temporary immobilization of assets and the risks associated with digital asset fluctuation during the "staking" period (see id. ¶ 64).